# Whichcote *versus* Lyle's Executors.

1. A devise to trustees in trust for the separate use of testator's granddaughter, not then married or contemplating marriage, vests a complete legal estate in the granddaughter clear of the trust. Kuhn *v.* Newman, 2 *Casey* 227.

2. The estate being legal, the granddaughter and her intended husband could subject it to their own private law of enjoyment and transmission, by articles of marriage settlement.

3. Such articles of marriage settlement are binding upon the husband, although the wife was a minor at the time of their execution. Wilson *v.* McCullough, 7 *Harris* 87.

4. But such articles do not affect the descent and inheritance of the wife's property after her death, except by express provisions; and without these or a proper will, her estate descends according to law.

5. If the articles of marriage settlement limit the husband's interest in the estate, in the event of the wife's death without issue, to a life estate, he cannot claim the personal estate absolutely, but is restricted to the interest agreed upon.

6. Where a female in her minority enters into articles of marriage settlement, the weight of authority inclines in favour of her right to disaffirm such arrangement as to her real estate; but it also declares that she and her successors in estate may ratify it.

7. If the successors to the wife in estate, after her death, instead of disaffirming the articles, claimed under them for the personal estate subject to

[Whichcote *v.* Lyle's Executors.]

the right of the husband to receive the interest during his life, according to the provisions of the articles, and by paying to the husband the rents and profits of the realty, such acts amount to a ratification of the articles and preclude them from denying the right of the husband under them.

8. The articles were not void, for the husband was bound by them, and they could only be avoided by a complete disaffirming act. They cannot be affirmed as to part, and disaffirmed as to the rest.

*Quære,* whether a husband, being an alien, can take as tenant by the curtesy, under the Act of 16th April, 1844.

CERTIFICATE from Nisi Prius.

On the 30th January, 1855, a bill in equity was filed by Sir Thomas Whichcote, administrator of Marianne Whichcote, his late wife, and in his own right, against Hartman Kuhn, Henry Becket, and John B. Newman, executors of James Lyle, deceased, in which was set forth, that James Lyle died on the 10th August, 1826, having first made his last will and testament, dated 24th July, 1826. That by the said will the testator, after appointing the respondents his executors, and empowering them to make sale and conveyance of any part or the whole of his real and personal estate, devised and bequeathed all his estate of every kind and description to such executors, their heirs and assigns, in trust to make as nearly as might be a division of such estate, into two equal parts, and that one of such parts to be held by them in trust for the separate use of testator's daughter, Mary Becket, during her life, and that free and clear of debts, liabilities, engagements, or contracts of her husband, in every respect as if she were a *feme sole*, with the right to take, receive, enjoy, and dispose of the interest, rents, issues, and profits at her sole will and pleasure, during her natural life, and after the death of Mary Becket, then in trust as to one moiety of the equal part of the one-half bequeathed to her for life to educate, maintain, and support the child or children of Mary Becket, whom she might have under the age of twenty-one years, until the arrival of such child or children at twenty-one years respectively, then in trust of the moiety of such half if there should be but one child, or a proportional part if more than one, for the sole and separate use of such child or children respectively, their heirs, executors, administrators, and assigns for ever; and that free and clear, if females, of any debts, liabilities, or engagements of their husbands, and subject, as to the income thereof, to their own and absolute control. And as to the other moiety of the equal half part of his estate devised and bequeathed to Mary Becket for life, in trust to apply and appropriate the rents, interest, and income of it in such manner and to such objects as Henry Becket, the husband of Mary Becket, might from time to time direct, limit, and appoint during his life, and from and after his death then in trust for the child or children of Mary Becket, their heirs, executors, administrators, and assigns, in like manner, to all intents and pur-

poses, and subject to the same provisoes, restrictions, and limitations as were mentioned with regard to the moiety of the equal half part of his estate thereby firstly disposed of after the death of his daughter, Mary Becket.

As to the remaining equal half part of his estate, he devised and bequeathed it to the same persons in trust for his daughter, Ellen Kuhn, for her separate use for life, and subject to the same provisions and limitations as the part devised and bequeathed to Mary Becket. That Mary Becket died on or about the 21st day of November, 1827, leaving her husband, Henry Becket, and two children, Marianne Becket and Hamilton Becket, both of whom were then in their minority, her surviving. That Marianne being still a minor, in contemplation of marriage then shortly intended between her and Sir Thomas Whichcote, a subject of Great Britain, and domiciled in England, certain articles of agreement or marriage settlement bearing date the 9th day of July, 1839, for the purpose of securing and settling the fortune of the said Marianne Becket, were duly executed, in England, by and between Sir Thomas Whichcote of the first part, and by Marianne Becket and Sir John Becket, brother of Henry Becket, and uncle of Marianne, of the second. And by Lord Villiers and Christopher Turner, Esquire, trustees under the settlement of the third part. In this marriage settlement it was recited and agreed as contained in the following abstract or synopsis :—

" And whereas, under the will of the said James Lyle, deceased, the maternal grandfather of the said Marianne Beckett, she, the said Marianne Beckett, is entitled in possession to the income of one equal fourth part of the real and personal estate of the said testator, consisting of landed property situated at or near Philadelphia aforesaid, and of stock in the public funds of the said United States, moneys due and owing on the bonds of persons resident in the said United States, and other property, which, or the securities of the same, and the evidences of the title thereto, are at Philadelphia aforesaid, or elsewhere in the said United States, and the said Marianne Beckett is in like manner entitled in expectancy, after the death of her said father, to the income of one other equal fourth part of the said real and personal estate of the said James Lyle, deceased, and is also entitled in expectancy, on the decease of her said father, and on the decease without issue, of her brother Hamilton Beckett, or on one of these events, or on some other event or events, to the remaining two-fourth parts of the income of the said real and personal estate, but by reason of the said will of the said James Lyle, being in the said United States, and no copy or abstract thereof being in this country, the particulars of the said property and the extent of the interest of her the said Marianne Beckett, of and in the same, and of any trusts or limitations to which the same may be subject, are not

[Whichcote *v.* Lyle's Executors.]

known to the parties to these presents. And whereas, upon the treaty for the said intended marriage, it was proposed and agreed in consideration thereof, that the said Sir Thomas Whichcote should settle his estates (consisting of divers manors or lordships capital and other messuages, lands, tenements, and hereditaments situated in the county of Lincoln), in such manner as to secure to the said Marianne Beckett for her life, in case the said intended marriage should take place, and she should survive the said Sir Thomas Whichcote, an annuity or yearly rent-charge of £1500, to be issuing out of the said estates or some part thereof, and subject thereto, and to such charge for the portions of younger children of the said intended marriage, in the event of there being four or more such younger children as hereinafter mentioned, that the said estates might stand limited to the use of the first and other sons of the said intended marriage, successively in tail male, and it was also proposed and agreed by and on the part of the said Sir John Beckett and Marianne Beckett, in consideration of the said intended marriage, and of the settlement so to be made of the estates of the said Sir Thomas Whichcote, that such covenants or articles of agreement should be entered into for the settlement *of all the fortune of her*, the said Marianne Beckett, in possession, reversion, remainder or expectancy, and whether vested, contingent, executory or otherwise, as hereinafter expressed and contained. To the intent that the income of the said fortune should, during the joint lives of the said Sir Thomas Whichcote and Marianne Beckett, be charged with the payment of an annuity of £500 to her the said Marianne Beckett, for her separate use by way of pin-money, and subject thereto, should go and be enjoyed by the said Sir Thomas Whichcote, and should after the decease of either of the said parties, be enjoyed by the survivor of them for his or her life, and that after the decease of such survivor, the whole of the said fortune should be settled upon or for the benefit of the children of the said intended marriage (other than an eldest or only son for the time being, entitled to the first estate of inheritance in possession or in remainder of and in the said estates of the said Sir Thomas Whichcote). And it was further proposed and agreed, that in case the number of the younger children, between whom the said fortune of the said Marianne Beckett should become divisible, should be four or more, the sum of £10,000 should be provided, to be raised out of the said estates of the said Sir Thomas Whichcote, to be added to the said fortune of the said Marianne Beckett, for the augmentation of the portions of the said younger children. And whereas, the settlements so proposed and agreed to be made of the estates of the said Sir Thomas Whichcote are or are intended to be effected by other indentures already prepared, and bearing or intended to bear even date with these presents."

"The said parties of the first and second parts were therefore within one year, to be computed from the day of the solemnization of the said intended marriage, at the costs and charges in all things of the said Sir Thomas Whichcote, to settle and assure all said real estate, lands, tenements, hereditaments, and premises, moneys, securities for money, stock in any public funds, or fund, company, or companies' debts, bonds, bills, and securities whatsoever, and other personal estate of, in, or to which the said Marianne Beckett now is, and also of, in, or to which she or the said Sir. Thomas Whichcote in her right shall, at the time of making such settlement, be seised, possessed, interested, or entitled, whether at law or in equity, and whether in possession, reversion, remainder, or expectancy or otherwise, and whether vested, contingent, or executory, present or future, unto, and to the use of them, the said George A. F. Viscount Villiers and Christopher Turner, or the survivor of them, and their or his heirs, executors, administrators and assigns, upon and for such trusts and purposes as are hereinafter mentioned concerning the same, that is to say,—in case it shall appear that the said fortune of the said Marianne Beckett, or any part thereof, is wholly or partially subject to any settlement or trust for the sole and separate use of her the said Marianne Beckett, free from the control of any husband, or to any settlement or trust upon, or for the benefit of any child or children of her, the said Marianne Beckett, then upon such trusts and in such manner as shall be proper and sufficient for confirming such settlement and trusts, for the sole and separate use of her, the said Marianne Beckett, with or without restriction upon alienation by her, as the case may be, and upon or for her child or children, or any of her children, as to all or such part or parts of her said fortune as shall appear to be subject to such settlement or trusts, according to the true intent and meaning of such settlement, or settlements and trusts respectively, and to the full extent thereof. And as to the whole of the said fortune of the said Marianne Beckett, in case it shall appear that the whole thereof is free from any such settlement or trusts as aforesaid, or as to such part or parts of the same as shall appear to be free from such settlement or trusts, and also as to the whole or such part or parts of the same as shall appear to be subject to any such settlement or settlements, or trusts (subject to the same and to such confirmation thereof as hereinbefore mentioned), upon and for the trusts, intents and purposes, and with, under, and subject to the powers, promises, declarations and agreements hereinafter declared, expressed and contained." Amongst which is a power to sell real estate and to collect the personal estate, and to convert the whole thereof into money, and to invest the balance, after payment of all charges, in the names of the trustees in the public stocks or funds of Great Britain, or at interest

in or upon any government or real securities in Great Britain, and out of the income to pay £500 sterling, yearly and every year, to the said Marianne Beckett alone, and without the said Sir Thomas Whichcote, her intended husband, notwithstanding her coverture, and as if she were sole and unmarried, for her own, sole, and separate use, as and for her pin-money. The payments to be made quarterly. The residue to be paid to Sir Thomas Whichcote, and after the decease of either of them to permit the survivor to take the dividends, interest, income, &c., for and during the term of his or her natural life, and after the decease of the survivor there are provisions made for the issue of the intended marriage which it is not necessary to state. And it was provided further,

" That in case there shall be no child or children of the said intended marriage, or in case the said trust premises or any part thereof, shall not become vested in any such child or children of the said intended marriage, either under the *trust hereinbefore* declared, or under any appointment or appointments to be made in exercise of the powers hereinbefore contained, or either of them, then and in such case, they the said trustees, and the survivors and survivor of them, and their or his heirs, executors, administrators or assigns, shall in the event aforesaid, stand possessed of the same or so much thereof, as shall not become vested as aforesaid, or be otherwise disposed of under the powers hereinbefore or in the said intended settlement to be contained, and the interest, dividends, and yearly proceeds thereof, from and immediately after the determination of such of the trusts hereinbefore declared, as shall take effect, and in the meantime subject thereto, in trust for such person or persons, and upon and for such trusts, intents and purposes, subject to such charges, limitations, powers, provisoes and declarations, and in such manner in all respects as the said Marianne Beckett, notwithstanding her intended coverture, and whether she shall be covert or sole, by her last will and testament in writing, or any codicil or codicils thereto, or any writing purporting to be, or in the nature of her last will and testament, or any codicil or codicils thereto, shall direct or appoint, and in default of or subject to any such direction or appointment as last mentioned, in trust for the said Marianne Beckett, in case she shall survive the said Sir Thomas Whichcote, her executors, administrators and assigns, absolutely (but not so as to revoke or make void any appointment by will previously made by her during her coverture, without some other act for that purpose done by her). But in case the said Marianne Beckett shall die in the lifetime of Sir Thomas Whichcote, then in default of or subject to such appointment as aforesaid, in trust for such person or persons as would have been the next of kin of her the said Marianne Beckett, and entitled to her personal estate according to the sta-

[Whichcote v. Lyle's Executors.]

tutes for the distribution of intestate's effects, if she had died a spinster and intestate, for their own use and benefit, and to be divided in the same shares and proportions as if the same had been the personal estate of her the said Marianne Beckett (subject always and without prejudice to the life interest of the said Sir Thomas Whichcote, under the trusts hereinbefore declared)."

The bill further charged that Henry Becket, the father of Marianne Becket, was a natural born subject of Great Britain, and has always so continued a subject, though residing in the United States.   And that the intended marriage was afterward, in July, 1839, duly solemnized between Sir Thomas Whichcote and Marianne Becket, she being then about nineteen years of age, and both continued to be domiciled in England.   That she attained the age of twenty-one years on the 27th April, 1841, and afterwards died intestate without issue, on the 10th day of May, 1849, and without having executed any appointment or settlement under the agreement or marriage settlement of 9th July, 1839.   That on the 25th May, 1852, letters of administration on her estate were duly granted by the register of Philadelphia to Sir Thomas Whichcote.   The bill further sets forth that Lady Whichcote took no estate in the premises under the will of her grandfather, James Lyle, during her minority; or if she took any it was subject to be defeated by her death in her minority, and only vested in her free from any contingency, when and after she became of full age.

That the property so devised and bequeathed, was in case of her marriage, clothed with a trust for her sole and separate use, and as she married while yet a minor and continued covert until her death, it could not under any circumstance become freed and discharged therefrom.   That being subject to such trust for her separate use, the operation of the marriage settlement of the 9th July, 1839, was merely to confirm the trust for her separate use, but did not otherwise alter or affect her absolute interest therein; and the same therefore upon her death, so far as the same consisted of personal estate, both principal and interest, and all arrears thereof, vested absolutely in the complainant, who is now entitled to have the whole thereof paid over to him as the administrator, for his own use and behoof; and so far as it consisted of real estate, that he is entitled to have all arrears of the annual income or proceeds thereof, due at the time of the death of his wife, in the hands of the trustees, also paid over to him as administrator, for his sole use and behoof; and to have the income and profits of the same since her death, paid over to him for his own use during his natural life.

The bill then alleges a demand upon the respondents by the complainant for the personal estate, and the income and profits of the real estate, and a refusal to pay the same over to him, or

account to him as administrator, or to pay to him the income and profits of the real estate.

It concludes by a prayer for an account of the estate in the hands of the trustees, and that they shall abide all such further orders and decrees as to the court shall seem meet, &c.

The answer of defendants admitted the main facts of the cause as set forth in the complainant's bill; and also set forth that shortly after the death of James Lyle, an informal division of his estate was made as nearly in conformity with the directions and intentions of the testator as could be done, and that the whole interest, dividends, rents, and income of the divided and undivided moiety of the estate, constituting the share of Mary Becket, was duly accounted for and paid over to her for her seperate use until her death. That from her death to the time of answer filed, they have, according to the provisions of the will, accounted for and paid over to Henry Becket, for his use, the one-half of the income of this share, as provided for and directed in the will. That during the interval between the death of Mary Becket and the majority of Lady Whichcote, the other half of the dividends, and income of the other half of the estate, devised and bequeathed to Mary Becket, was carried to a separate fund. That on the 27th April, 1841, the date of Lady Whichcote's majority, the accumulated fund amounted to $55,302, after deducting the expenses incurred for and on account of herself and her brother, Hamilton Becket. That her portion of this fund then amounted to $27,651.30, and which was invested by them under the directions of the will; and that the whole income of this fund, from that day to the present, has been accounted for and paid to the complainant. And the income of the residue, being one-eighth of the testator's whole estate, real and personal, or one-fourth of Mrs. Becket's share, was from that time duly accounted for and paid to the complainant until the death of Lady Whichcote.

The respondents then answer that they are advised that the capital of the estate, so far as it consisted of personal estate, would, at her death, have vested in and passed to the complainant, or be now recoverable by him as her administrator, had not the marriage settlement of the 9th July, 1839, limited his estate therein to an equitable interest for the term of his own life. That they are further advised and believe that he is entitled under the articles to the income of the personal estate for and during the term of his natural life. And that they have in accordance therewith accounted to him and paid over the interest and income of the said personal estate accrued since her death, and the accounts thereof settled and closed with him.

In bar therefore of the said bill, so far as it asks an account of income of personal as well as real estate to the death of Lady Whichcote, and of interest and income of personal since her death,

[Whichcote v. Lyle's Executors.]

the defendants plead the settlement and the closing of the said accounts with the complainants. They also aver that they are advised, that from and after the death of Lady Whichcote, the complainant was not in any manner entitled to the rents or profits of the real estate of said moiety. But that Henry Becket, one of the defendants, who, as the respondents are advised, is entitled for the term of his life to the rents and profits of this real estate, under the influence of motives and considerations with which his co-defendants have no concern, has appropriated, and intends to appropriate, the rents and profits of the said real estate to the complainant while they, Henry Becket and complainant, both live. They allege that they have, therefore, from the death of Lady Whichcote, accounted for and paid to the complainant the rents and profits of the real estate, as well as the interest and income of the personal, which would have been receivable by her, if still living; and that the accounts thereof have been fully settled and rendered in writing.

The defendants then demur to so much of the bill of complaint as prays that rents or income of the real estate, since the death of Lady Whichcote, shall be decreed to him, and to all such parts as pray an account or discovery or other relief as to such subsequently accrued or accruing income of the said real estate. And for cause of demurrer show : First, That if the said marriage settlement had never been made, the complainant would have had no interest, legal or equitable, in the said real estate, for the reason that as an alien he would have been incapable of taking or holding as a tenant by the curtesy. And for the further reason that the only estate of the said Marianne Lady Whichcote therein, was under a trust for her separate use, not admitting of tenancy by the curtesy. In the portion of the said real estate, of which under the will the rents are subject to the order and direction of Henry Becket during his life, the interposition of this equitable life estate would prevent the complainant from taking an estate by the curtesy at the death of Henry Becket. Secondly, That under the marriage articles, the complainant could not take or acquire any interest, for life or otherwise, unless the said articles had been carried into effect or confirmed in the lifetime of his wife, by a subsequent proper assurance made by himself and wife, and acknowledged by her according to the statutes in that behalf, and no such assurance was alleged to have been made at any time.

They further demur to so much of the bill as is founded upon the allegation that the complainant is absolutely entitled as administrator to the capital of the personal estate, and the payment and transfer of the same to him. And for cause of demurrer show that he is not entitled as administrator or otherwise, for the reason that from and after his wife's death his estate therein was, by the effect and operation of the marriage articles, limited to an

interest for his own life only, or the right to receive the income
during his life.  That the eldest son, if any, of the intended mar-
riage, was to be provided for out of his own estate, from which the
said Lady Whichcote was to receive a jointure.  And that for
this, the equivalent was the settlement of her fortune upon the
younger children in expectancy, with no reservation except that
of an allowance to her for pin-money during the marriage, and a
surviving interest to her for life.  That the covenant by her uncle
stood in the place of the performance by her of which she might
be incapable on account of her minority : but that the complainant
was bound by the articles from their date as to the personal estate
as fully as if she had been of full age, or had afterward confirmed
them.  They therefore demur to the parts of the bill referred to,
and pray the judgment of the court whether they shall be com-
pelled to answer thereto.

The answer concludes with a prayer that the defendants may
be hence dismissed with their costs.

There was a general replication and joinder in demurrer.

On the 30th April, 1857, the death of John B. Newman, one
of the executors of James Lyle, was suggested ; and, by agree-
ment, the style of the suit was amended accordingly ; and, on the
same day, the Court of Nisi Prius, Mr. Justice WOODWARD sitting,
after argument, dismissed the bill of complaint.  Whereupon the
complainant had the record certified to the Court in Banc.

*H. J. Williams* and *T. Dunlap*, for complainant.—Two ques-
tions arise : 1. What are the rights of complainant under the will
of Mr. Lyle ?  2. How are they affected by the marriage settle-
ment ?  The first naturally divides itself into the rights as to the
personal estate and the real.  It appears to be admitted that his
right to the personal estate would be absolute under the will.  Such
is undoubtedly the case.  Lady Whichcote had, under the case of
Kuhn *v.* Newman, 2 *Casey* 227, decided since this bill was drawn,
an absolute estate freed from all trusts and restrictions.  In such
case, unless affected by the marriage settlement, the husband would
be entitled to the whole personal estate.

As to her real estate, the complainant asks for a decree in his
favour of the rents and profits to the time of his wife's death as
personalty, and to an estate for life in the realty.

The answer admits his right to these up to his wife's death, and
avers they have been paid.  No account is desired by complainant,
the object being merely to settle the *rights* of the respective
parties.

The birth of issue not being required in Pennsylvania, is he
entitled as tenant by the curtesy ?

This is denied, under the authority of Reese *v.* Walters, 4 *W.
& S.* 145, he being an alien.  Acting upon the suggestion of the

Supreme Court in that case, the legislature passed the Act of 16th April, 1844, to enable aliens to *inherit by descent or otherwise,* with a saving of vested rights.

Upon this act three questions arise: 1. Are the vested rights of any person impaired by the construction we contend for? 2. Does the complainant, upon the death of his wife, inherit by descent or otherwise? 3. Is the act prospective, or retrospective only?

The 1st point is clear. Lady Whichcote was seised, under the will, of an equitable estate for life, with an absolute remainder in fee, or of an absolute estate in fee so long as she lived; and, having no children, no one had any vested rights but herself; the proviso therefore did not apply.

2. If not an alien he would be clearly entitled to an estate for life in the real estate. Act of 8th April, 1833, § 1, Art. 3. Is the present case embraced by the Act of 1844? Does the complainant *inherit* his curtesy estate by *descent or otherwise?* The word "inherit" is defined to mean "to take by descent from an ancestor, or to take by succession as the representative of the former possessor." It will be observed that aliens, by Act of 23d February, 1791, were allowed to take by *descent or devise,* and by Act of 24th March, 1818 (except alien enemies), by purchase. The Act of 1844 could apply to nothing, if not to curtesy and dower, according to the suggestion of the Supreme Court, to "*cut up by the roots*" this peculiar disability.

3. Is the act prospective, or only retrospective?

Reese *v.* Walters limits the effect of the word "purchase," and decides that aliens cannot hold by the curtesy. The legislature appear to have had two objects in view: 1st to confirm certain purchases, and to remove the disabilities of alien husbands and wives. The first clause as to purchases is clearly retrospective. It contains no words referring to the future, but refers to "purchases heretofore made." But the succeeding clause is totally different: "In all cases where any such aliens *shall have inherited* the same by descent or otherwise." It is in the second future tense.

The complainant is therefore entitled, under the will of Mr. Lyle, to the personal estate of Lady Whichcote. To the arrears of the income from the real estate, and under the act to a life estate in her hands as tenant by the curtesy.

II. The second question is, how are these rights affected by the marriage articles?

It is submitted that they confirm all the trusts and limitations in the will. Or they settle her estate upon the trust contained in it. As previously stated, Kuhn *v.* Newman decides that she took a vested legal estate in fee simple, free from all restrictions. But it was clearly competent for her to settle her estate upon the

[Whichcote *v.* Lyle's Executors.]

trusts contained in the will, though they were not binding upon her. The learned gentlemen then referred to the marriage articles, and argued that they were a confirmation of the trusts in the will for the benefit of Lady Whichcote for life, &c.; and that the complainant would be entitled to the whole personal estate at her death.

With regard to the real estate in Pennsylvania, if the marriage articles ratified the trusts in the will, the husband is entitled to a life estate by the curtesy in the part not subject to the life estate of Mr. Beckett her father. Upon this view he would be entitled to curtesy as if the trusts of the will had been created by the marriage settlement; and that although decided not to be valid under the will, would be so under the settlement. But in such case his title would be derived under the settlement and not the will; alienage would not be applicable, as the Act of 1818 removes all disability in cases of purchase.

But it is said curtesy does not arise where real estate is held in trust for the separate use of the wife, and Cochran *v.* O'Hern, 4 *W. & S.* 95; Stokes *v.* McKibbin, 1 *Harris* 267; and Rigler *v.* Cloud, 2 *Id.* 361, are supposed to establish this position. But in those cases there was a clear intention expressed in the instruments that the estate should not at any time be subject to the control of the husband. In this case it is only "free and clear of any debts, liabilities, contracts, or engagements of the husband, and subject as to the income thereof to her own free and absolute control." These restrictions only operate during the life of the wife. The instrument must be construed according to the English law, having been made there: Duncan *v.* Cannon, 23 *Eng. L. & E.* 288, 299. It is admitted by Ch. J. GIBSON, in Stokes *v.* McKibbin, 1 *Harris* 268, that in England a husband might be tenant by the curtesy of the wife's equitable estate, notwithstanding a naked direction that the income be held for her separate use; Morgan *v.* Morgan, 2 *Madd. R.* 408. But if the foregoing ground is not well taken, then Sir Thomas Whichcote will take his wife's estate under the trusts, terms, and limitations of the marriage articles. These give to him the interest and income of the personal, and the rents and profits of the real, as survivor according to its terms.

To this it is objected: 1st, That though Lady Whichcote is bound by the articles as to the personalty, executed while she was a minor, she is not as to the real estate. 2d. That he not having executed any further settlement as contemplated by the articles, he is not entitled to claim under them.

1st. This question in England is involved in doubt: *Atherly on Marriage Settlements,* p. 28–29; Milner *v.* Lord Harewood, 18 *Ves.* 275, 280. On the death of the wife, in the lifetime of the husband, her real estate descends discharged of the articles: Pim

[Whichcote v. Lyle's Executors.]

v. Insall, 7 *Hare* 193. If it descend under the intestate laws, the husband would have his curtesy in the moiety not subject to the life estate of Henry Beckett.

2d. The objection that the articles were not confirmed in the lifetime of the wife by the execution of assurances as therein provided for, and that therefore the complainant could take no interest legal or equitable, for life or otherwise in the real estate. There are express covenants in the articles that the estates of Sir Thomas shall be settled according to the intention recited. He was thus as completely bound by these instruments as if the conveyances had been made: Ath. on *Mar. Set.* 125–126, 27 *Law Lib.* 66; Osgood v. Strode, 2 *P. Wms.* 255. The covenant for the subsequent settlements was joint and mutual, and, unless a refusal was proved on the part of the complainant, it was the neglect of both parties to the covenant, and neither can take advantage of it. Such omission, if it produce the effect suggested, would render the articles entirely invalid, and leave the parties as if they never had been made. In that event he would be entitled under the will.

*John M. Read, John Cadwalader,* and *St. G. T. Campbell,* for respondents.—For all the purposes of this argument, the construction of the will of James Lyle has been settled by Kuhn v. Newman, 2 *Casey* 227. According to this, Mary Anne Beckett had a vested estate in fee simple in the real estate, and an absolute estate in the personalty, subject to the disabilities of infancy which no court could remove. A marriage settlement in England, between an adult male and an infant female, derives all its force from the interest in the wife's property which the husband acquires by the marriage: *Macq. Hus. & W.* 248–251. The consideration of marriage being a valuable one, he is bound to carry out all his covenants.

He was an alien, and therefore took no interest in the real estate of his wife in Pennsylvania. Her whole fortune was included in the settlement, and his power over the personal, unless affected by the will, is certain. Her whole fortune was derived under the will of Mr. Lyle, and was subject to no settlement or trust interfering with the husband's power over it. That the object of referring to the will, in the marriage articles, its real contents being unknown, was to avoid any conflict with its provisions, and the intention was to dispose of the whole fortune uncontrolled by any trusts or settlements, except those contained in the marriage articles of the 9th July, 1839. That by this indenture Sir Thomas has only a life interest in the personalty. The argument of our learned opponents, in relation to the confirmation of a supposed trust, which never existed, is based on a fallacy. The articles were not intended to settle the whole fortune upon the trusts of the settlement itself, and not upon imaginary trusts which they had never

seen, and which had no existence in law or fact.   Whatever his interest would have been, he has expressly limited himself to a life estate.

Upon this point the language of this court in Talbot *v.* Calvert, 12 *Harris* 327–330, is pertinent and appropriate : Marshall *v.* Beale, 6 *How.* 70, citing 6 *Gill. & John.* 349 ; 7 *Id.* 229.   It is clear, therefore, that Sir Thomas has but a life estate in the personal.

As Miss Beckett could not bind her real estate, being an infant, and as her husband took no interest in it in 1839, being an alien, his only possible claim is as tenant by the curtesy.

Has the legislature changed the law since 1839 ?   They had not in 1842.   Reese and Waters decided that an alien cannot be tenant by the curtesy.   A brief examination of the Acts of Assembly will show that the law remained the same at Lady Whichcote's death.   The Act of 31st August, 1778, 1 *S. L.* 461, relates only to aliens not born in allegiance to the crown of Great Britain.   The Act of 23d February, 1791, 3 *Smith*, p. 4, did not authorize aliens to purchase lands, nor the alien heir or devisee of an alien to take by devise or descent ; but did enable an alien heir or devisee of a citizen to take : Rubeck *v.* Gardner, 7 *Watts* 455.   The Act of 10th February, 1807, 4 *Smith* 362, allowed aliens resident, and who had declared their intentions to become citizens, to purchase and hold not exceeding 500 acres.   The Act of 20th March, 1811, 5 *Smith* 211, confirmed certain purchases and sales.   The Act of 22d March, 1814, 6 *Smith* 178, extended this last act to all purchases made since its date, and allowed aliens to hold and convey lands not exceeding 200 acres, nor $20,000 in value.   The Act of 24th March, 1818, 7 *Smith* 133, made it lawful for aliens, not the subjects of any power at war with the United States, to purchase not exceeding 5000 acres, and to hold the same as natural born citizens could do, and confirmed certain purchases made.   The Act of 31st March, 1837, *P. L.* 121, is a supplement to that of 1818, and confirms purchases made under it, and all sales made by alien purchasers ; and, in the case of alien resident purchasers who died without being naturalized, the title is confirmed to the heirs.

The Act of 16th April, 1844, *P. L.* 274, is a further supplement to the Act of 1818.   Confirms the title of aliens to lands previously purchased, not exceeding 2000 acres.   " And in all cases where such aliens shall have inherited the same by descent or otherwise, the title of such aliens is hereby confirmed : and it shall be lawful for such alien or aliens to hold the same as fully to all intents and purposes as any citizen of the United States might or could do : Provided," &c.   This act, like that of 1837, is clearly retrospective, and made to confirm titles already acquired.

It has no application to the present case, and the case of Reese *v.* Waters must be the rule of decision here.

It has also been decided that the term purchase does not include this kind of estate. A tenant by the curtesy is neither by descent, devise, or purchase; but by act and operation of law. It commences in the lifetime of the wife, and is continued after her death; being *initiate* in the one case and *consummate* in the other : 1 *Stephens' Com.* 368; *Id.* 254, 255; 4 *Kent,* 7th ed. 26–28; *Burton on Real Prop.* 8th ed., 120, § 348. Descent from a person seised in fee does not always confer immediate enjoyment of the estate; it may be subject to the claims of a husband or wife of the deceased. The whole subject is clearly stated by Chief Justice LEWIS in Crow *v.* Kightlinger, 1 *Casey* 343. "A person, having different rights of entry, is in general not barred until the statute has run against them all." "But the estate which a husband holds in right of his wife is but one estate, although it be perfected by stages; and the husband has but one right of entry in regard to it:" Lancaster County Bank *v.* Stauffer, 10 *Barr* 398; Lefever *v.* Witmer, *Id.* 505; *Bright. Purd.* 571, pl. 12, 13.

Such being the case, Sir Thomas Whichcote does not come within the letter or the spirit of the Act of 1844; and the law, therefore, as to his case, remains as it was decided in Reese *v.* Waters, in 1842.

It may be proper to remark, that, if this be a trust for the separate use of Lady Whichcote, in fee simple, then the cases of Cochran *v.* O'Hern, 4 *W. & S.* 95; Stokes *v.* McKibbin, 1 *Harris* 267; and Rigler *v.* Cloud, 2 *Harris* 361, are entirely in point, and Sir Thomas Whichcote "has not the shadow of interest as tenant by the curtesy."

Upon the whole case, viewed in every aspect, First, as to the personalty, Sir Thomas Whichcote has excluded himself by the marriage articles from all but a life interest in it.

Second. As to the real estate, it never passed under the articles, and his alienage excludes him from all title as tenant by the curtesy.

The opinion of the court was delivered by

LOWRIE, J.—Nearly all the points in this case are ruled by the principles enunciated in some recent decisions, and the others are of very easy solution.

Since this suit was brought we have decided in Kuhn *v.* Newman, 26 *State Rep.* 227, that Mr. Lyle's granddaughters, including the plaintiff's wife, took legal estates under his will, not subject to the trusts therein attempted to be imposed upon them. There is a seeming conflict between that case and the case of Steacy *v.* Rice, 27 *Id.* 75, but the latter case is reported two years out of time, and after a change of reporters, having been tried in

[Whichcote *v.* Lyle's Executors.]

May Term, 1854, and omitted in the cases of that term. The conflicting expressions are, in the opinion of our brother BLACK, but the other reported opinion, and not his, expresses the opinion of the court. His was delivered in order to express some views of his own in which his brethren did not concur, and it is by mistake of the reporter that it is called the opinion of the court.

The estates being legal, the plaintiff and his wife had such control over hers as to subject it to their own private law of enjoyment and transmission by their articles of marriage settlement; and it was decided, in Wilson *v.* McCullough, 19 *State Rep.* 87, that the husband is bound by such articles, although the wife was a minor at the time of their execution. But such articles do not affect descent and inheritance of the wife's property after her death, except by express provisions; and without these or a proper will, her estate descends according to law: 23 *State Rep.* 29. We think that the parties intended, by the articles of 9th July, 1839, to exercise all the power of settlement over the intended wife's fortune, that was consistent with the character of her title thereto, and that those articles define what are the rights of the husband in the event which has happened—the death of the wife without issue.

In the personal property his interest is a life estate, for he has limited himself to that, and the defendants concede it.

But they say that the wife, on account of her minority, was not bound by the articles so far as concerned her real estate, and that the husband, being an alien, cannot, under the decision in Reese *v.* Waters, 4 *W. & S.* 145, take it as tenant by the curtesy.

We do not think however that the defendants in interest, being the successors in estate of the plaintiff's wife, after the settlement, are in a position to say that the articles are unavailable as against the real estate. No doubt the weight of authority inclines in favour of the wife's right to disaffirm such an arrangement; but it also declares that she and her successors in estate may ratify it: 5 *S. & R.* 312; 3 *Atk.* 616, 617; 5 *Ves.* 717; 18 *Id.* 276; 1 *Bro. C. C.* 116; *McPherson on Infants* 454, 465, 487, 521.

The successors in estate of the wife had the opportunity, on her death, to disaffirm; but instead of that they ratified the articles, by claiming under them for the personalty, and even by paying the income of both personalty and realty to the plaintiff. They cannot affirm part and disaffirm the rest. If they disaffirm at all the plaintiff will take the personalty as legal successor of his wife, whatever may become of the realty. The articles are not void, for the husband is bound. They can be avoided only by a complete disaffirming act on the other side, and none such is intended. The articles of marriage settlement are therefore the law of the husband's rights relative to his wife's estate, real and personal.

Let the decree be drawn accordingly.